Leonard G. **HERRON**, Joseph C. Herron and Quintus H. Herron, individually and as Trustees of the Herron Trust, Plaintiffs in Error,

v.

Lee **SWARTS**, Defendant in Error.

No. 38514.

Supreme Court of Oklahoma.

March 1, 1960.

Tom Finney, Idabel, Lloyd Story, Valliant, for plaintiffs in error.

Ed R. LeForce, William N. Christian, Idabel, for defendant in error.

BERRY, Justice.

In 1957, defendant in error, Lee Swarts, hereafter referred to as "Swarts", instituted this action against plaintiffs in error, Leonard G. Herron, Sr., Joseph H. Herron and Quintus Herron, individually and as Trustees of the Herron Trust, a common-law trust, and others, for possession of 40 acres of remote, wild timber land, lying in McCurtain County, Oklahoma, damages for trespass thereon and to quiet his title thereto. No evidence was presented on the cause of action for damages.

The case was tried to a jury and from an adverse verdict and judgment thereon, the above named plaintiffs in error perfected this appeal.

Prior to 1944 Swarts and Leonard G. Herron, Sr., were, as partners, engaged in the timber and lumber business in McCurtain County. As partners they owned many acres of timber land in McCurtain County, including the 40 acres in controversy. Following dissolution of the partnership in 1943 or 1944, Leonard G. Herron, Sr., conveyed said 40 acres to Swarts.

In 1948, Joseph H. Herron, hereafter referred to as "Joe", purchased the 40 acres from McCurtain County at a resale based upon allegedly delinquent 1944 ad valorem taxes. The resale tax deed was filed of record May 11, 1948.

The plaintiffs in error do not dispute Swarts' contention that the resale tax deed is void in light of the fact that Swarts did everything necessary to pay ad valorem taxes on the 40 acres in 1944 and that the taxes would have been paid except for mistake of the taxing officials.

At all times in controversy the Herrons, who are related, were engaged in the lumber and timber business. It appears that from 1948 to 1951 the Herrons as partners owned several thousand acres of timber land in McCurtain County. In 1951 the Herron Trust was organized and from date of organization on it owned the timber land. The accounts of the Herrons were carried under the name "Herron Industries". Herron Industries, Inc., which was owned and controlled by the Herrons operated a lumber mill in McCurtain County. While record title to the 40 acres was in Joe, the money used in purchasing the 40 acres came from the funds of the Herrons and beneficial title to the 40 was first in the partnership and later in the trust.

The Herrons paid ad valorem taxes on the 40 for 1948, 1949, 1950, 1951 and 1953 and offered to timely pay 1952, 1954, 1955 and 1956 ad valorem taxes which offer was refused by the taxing officials because Swarts had paid the taxes prior to the offer being made.

The Herrons and three of their employees gave the following referred-to testimony in connection with plaintiffs in error's contention that they went into possession of the 40 acres under the tax deed in 1948 and thereafter remained in possession of same.

In 1948 or early 1949, through use of a hand compass, the boundary lines of the 40 were established. Upon the boundaries being established, a sign was placed at each corner of the 40 and along the rough, private road that extends through the 40. The sign read in part thus: "Notice This Timber Owned By Herron Industries Trespassing and Thievery Will be prosecuted to the full extent of the law Herron Industries, Idabel, Okla." In 1950 the lines of the property were marked by painting red paint on a number of trees growing on or near the boundary lines of the property.

The method of identifying the 40 was that customarily used by owners of timber land in McCurtain County. In 1951 or 1952 the boundary lines were marked by painting orange paint on trees growing on or near the property line. Two of the Herrons and their three employees went upon the 40 from time to time between 1948 and 1956 for the purpose of replacing the referred-to markers, painting trees along the boundary line, inspecting the timber and cutting timber. In 1951 timber was cut in order to thin the timber. The timber was made into posts or cord wood which was "yarded" on the 40 near the road that extended through a portion of same. About a year after the timber was cut the posts and cord wood were hauled from the land by the Herrons.

In support of his contention that the Herrons did not go into possession of the 40, Swarts presented this testimony. An agent for the Soil Conservation Agency testified that he went upon the 40 in 1955 and that he "didn't observe" that any timber had been cut off the 40; that he saw the Herrons' markers and asked Swarts, who had listed the land as his in the Soil Conservation Program, whether the land was his. On cross examination the witness testified that he was only on "the south and west line" of the 40. One of Swarts' employees testified that he went upon the 40 in 1955 for the purpose of inspecting the timber; that he noticed a "painted line"; that the paint he saw was not bright (was old); that he "did not observe" any evidence of any trees having been cut off the 40. Swarts testified that a few weeks before the trial he went upon the 40 and saw seven or eight trees around the 40 which had been painted; that some of the paint was old and some new; that he "never noticed any" evidence of trees having been cut on the 40. Swarts did not testify that he was upon the 40 between 1948 and the time that he went upon same shortly before the trial in 1957. The evidence shows that from 1948 to 1955 Swarts' sole acts of proprietorship over the 40 was paying ad valorem taxes thereof for certain years and continuing to leave the 40 listed with the Soil Conservation Agency.

Swarts contends that the referred-to evidence which is negative in character tended to refute plaintiffs in error's evidence relative to cutting and marketing timber. Assuming the correctness of Swarts' contention, said evidence did not tend to refute other evidence presented by plaintiffs in error relative to going into possession of the 40 in 1948 and thereafter continuing in possession. In fact, the evidence offered by Swarts tends to corroborate plaintiffs in error's evidence that trees growing along the lines of the 40 were marked long before 1955.

In view of the fact that the 40 was remote, wild timber land, we are of the opinion that the evidence clearly shows that the actions of the Herrons from 1948 or early 1949 on were such as to clearly show that they claimed to own the 40. In 2 C.J.S. Adverse Possession § 43, p. 557, this was said in connection with acts that tend to establish adverse possession of land:

"* * * acts of ownership of such character as openly and publicly to indicate an assumed control or use which is consistent with the character of the premises in question; such acts as would ordinarily be performed by the true owner in appropriating the land and its avails to his own use; the exercise of such acts of ownership and occupancy by claimant as are sufficient to 'hoist his flag' and keep it flying over the land; physical facts which openly evince and give notice of an intent to hold the land in hostile dominion or external and public signs or indications of the possession and intention to possess. * * *"

See also 1 Am.Jur. "Adverse Possession", Sec. 131, p. 866 and annotated notes, pp. 891–893, 170 A.L.R.

In McGrath v. Eichhoff, 187 Okl. 64, 70, 100 P.2d 880, 886, this is said:

"* * * The law does not attempt to list all of the acts of dominion which

may constitute such possession, so that what constitutes adverse possession, like the question of what constitutes negligence, often depends upon the circumstances of the particular case, as measured by the judgment of reasonable men. It has been said that such a determination in a given case must largely depend upon 'the situation of the parties, the size and extent of the land, and the purpose for which it is adapted. Johnston v. City of Albuquerque (12 N.M. 20), 72 P. 9, 11.' 1 Words & Phrases, First Series, p. 165.[1] "

See also Cox v. Kelley, Okl., 295 P.2d 1061, 1067.

This is said in Tucker v. McCrory, Okl., 266 P.2d 433, 435:

"* * * Actually residing on property is not a necessary element of the adverse possession required under the above quoted 5-year limitation statute. All of the authorities show that a person may be in possession of real estate without residing on it. Open, notorious and uninterrupted control and dominion over the property under claim of right is all that is required. * * *" (citing cases)

It is settled law in this jurisdiction that claim of owner to property sold for ad valorem taxes is barred by the five-year statutory period provided in 12 O.S. 1951 § 93(3) (6), where the purchaser at the tax sale files his tax deed and thereafter holds adversely for five years. See Cox v. Kelley, supra, and Gooding v. Edwards, Okl., 290 P.2d 408 and cited cases.

In the last cited case it was held that a purchaser at a tax sale acquires title by prescription where he holds the property sold adversely for five years following recording of his tax deed.

The fact that the Herrons did not, in fact, pay taxes for 1952, 1954, 1955 and 1956 is, under the facts of this case, without significance. See Cox v. Kelley, supra.

Swarts contends that Joe was the person who acquired the tax title and that Joe did not go into possession of the land; that the adverse possession, if any is shown, was by the Herrons (first the partnership and later the trust). The evidence as heretofore pointed out shows that Joe acquired the tax title for the benefit of those owning beneficial interests in the Herron partnership and those who became beneficial owners of the trust which was subsequently created and that the partnership furnished the money used in acquiring the tax deed. Under said facts we are of the opinion that adverse possession of the 40 by the partnership and the trust inured to the benefit of those holding beneficial interests in the partnership and the trust. In 2 C.J.S. Adverse Possession § 40, p. 554, this is said:

"Where color of title is held by cotenants, the possession of one inures to the benefit of all so as to ripen title in each according to his respective interests."

Plaintiffs in error's assertion of error based upon the proposition that the undisputed evidence clearly shows that they under Sec. 93(3) (6), supra, obtained title to the 40 by adverse possession thereof for a period of five years following recording of the tax deed thereto was preserved by their demurrer to Swarts' evidence by a request for a directed verdict, by their motion for new trial and by their petition in error with casemade attached.

In view of the fact that the uncontroverted evidence shows that plaintiffs in error held the property in controversy adversely for five years following recording of the tax deed and thereby acquired title by prescription thereto under Sec. 93(3) (6), supra, the trial court erred in not sustaining plaintiffs in error's request for a directed verdict.

In view of our decision herein, it is unnecessary to consider other contentions made by Swarts or plaintiffs in error.

---

1. 2A Words & Phrases Adverse Possession.

The judgment is reversed and the cause is remanded with directions to render judgment in favor of plaintiffs in error.

Reversed.

WILLIAMS, V. C. J., and HALLEY, JOHNSON, BLACKBIRD, JACKSON and IRWIN, JJ., concur.

WELCH, J., dissents.